May it please the court, my name is Douglas Ames, I'm here representing the appellant's plaintiffs in this case, and Mr. William Alderman is opposing counsel representing appellees, PG&E Corp. et al. In this case, essentially, during the summer of 2000 into the fall of the year 2000, there was a fixed retail electric rate established under state law of 5.4 cents per kilowatt hour. It's also undisputed that during the summer and fall, when electricity rates exploded, they were being charged as their cost of electricity between 15 and 20 cents a kilowatt hour. Now, most corporations would conclude under generally accepted accounting principles that they had an operating loss, that their cost of goods sold, their cost of their widget, was substantially in excess of what they could charge their customers. Instead, PG&E Corp. was recording and publishing to the financial community and to their investors profits that they had earned a net profit in the second quarter of 2000 of $250 million and during the third quarter of 2000 of $250 million. But didn't PG&E disclose the amount of the undercollections in its 10Q filings? So what was specifically misleading? The earnings reports. But they disclosed the undercollections. It's just how they reflected them on the balance sheets. I mean, whether they capitalized the assets, but they did disclose to the public the amount of the undercollections. Well, in their press release for the second quarter, they did not. Then in their 10Q, as Your Honor pointed out, there was in the second quarter way down some disclosure in their 10Q and also in their third quarter there was some disclosure. Compared to their earnings statements, which is what the financial community focuses on, was here they're reporting record profits. And their CEO was saying, we're expecting to grow earnings here. At the same time, by the third quarter of 2000, they had $2.9 billion in operating losses that they had taken off of their earnings statement and placed them on the balance sheet. But if you look at the numbers, you can see the numbers, and you can see how they're being treated. You might disagree as to the likelihood that the PUC will eventually allow them to kick them into the rate calculation. But the numbers are there. Everybody in this dog knew during this period that they were in trouble. Well, the analyst reports, both as alleged in the complaint and as included in the supplemental excerpts of records, kept saying, you know, they're reporting the profits, the stock's going to go up, buy this stock. Yes, there was some publicity reporting about their operating costs, but the fact is they continued to report and maintain that they were earning hundreds of millions of dollars a year. And the stock was going to go up or not go up, they were going to be in the end in trouble or not in trouble, depending on what the PUC did, correct? No. No. If the PUC had allowed them to raise their retail rates, they would not have gotten out of trouble? The PUC did not have the power to raise the retail rates. Oh, I should say not the PUC. I mean the state of California. The state legislature had established this law. It was in effect since 1996, AB 1890. The PUC had repeatedly told the utility that it could not raise its retail rates. There was all of this precedent, both in terms of PUC decision and the underlying law, as this court recently said in Southern Cal Edison v. Lynch, that the PUC did not have the power to change the law. But they did inform the investors that its ability to recover costs depended in large part on state regulatory action, did they not, in their statements? They specifically stated that. They specifically stated, among many other factors, such as weather and a number of other factors, that whether they could get the PUC to change its mind was a factor, both state and federal regulation. And in fact, for example, they made an emergency filing to the PUC in October of 2000, and the single PUC commissioner said the utilities noted that if they did not get their emergency relief, the PUC commissioner noted that they would likely have to write off these losses in the third quarter, these under-collections. The PUC never granted them the emergency relief that they sought. But that possibility was revealed to the stockholders. Yes. There was disclosure in the 10-Qs, as Your Honor notes. So you have on the one hand the earnings statement, and you have on the other hand some disclosure in notes to the financial statements. And how does the financial community, how does the reasonable investor react to that? Does the reasonable investor have on his radar screen what's in some notes in the 10-Q, or is it what's being blared in their press releases as their earnings numbers? Certainly the earnings is a major, major factor to any investor making an investment decision. Now, they, for example, relied upon an accounting provision, Federal Accounting Standard 71, which basically applies to regulated industries that were operating under an old regime of cost-based regulation, where they were guaranteed a rate of return. And if there was some momentary capitalization of costs because they were guaranteed a rate of return, then under this accounting procedure, yes, they could capitalize costs. If it was objectively reasonable that they could recover those costs. I think the word is probable. Isn't that the word in FAS 71? And here it was totally improbable because there was state law specifically stating they couldn't do what they were doing. But the probability or improbability was not, as it were, proprietary information. Anybody looking at this from the outside is probably in almost as good a position as PG&E to predict because it's a political probability rather than a sort of a financial or internal operating probability. It's a political probability if there was any chance that they could get the PUC to change. Yeah, that's right. That's what I'm saying. But here there was no chance that they could get the PUC to change. The PUC was powerless to change the law as they repeatedly told the utility. But I think you and I just went back and forth. The vocabulary slips without our misunderstanding each other. It's the entire regulatory process of the state of California of which the PUC is a part. That is to say, if the PUC is, as it's concluded it was, powerless to change, the legislature, of course, has the power to allow the PUC to change. The question really is, if I can use an umbrella term, a political question then as to whether or not they're going to get what they want out of the state. As it turned out, they didn't. Was it probable that they could get the state legislature to change the law? Yeah, that's basically the question as to probability under FAS-71. Well, no, under FAS-71 it's not a question of whether it's probable they can get the state to change the law. FAS-71 applies to cost-based regulation where the utility is guaranteed a rate of return. And the regulators have essentially always established that cost-based regime. Here it's not ever contemplated under FAS-71 as to whether or not the utility could make a probability determination that the state legislature is going to change the law. Okay. That was never contemplated under FAS-71. And, in fact, as this court noted in Southern Cal Edison v. Lynch, under the California Constitution, the PUC was powerless. So if, in fact, what they were gambling on was that they could get the state legislature to change the law, that was certainly not a probability determination that could be made that under any generally accepted accounting procedure that would allow them to then take their operating losses and put it on the balance sheet. Yes, there was some disclosure in their 10 Qs, and you counterbalanced that with their earnings numbers, and the analyst reports went right along with their earnings numbers. They just essentially parroted what the utility said was their probability of return. If I'm a reasonable investor and I'm reading the newspapers, wouldn't I be put on notice that there was a real problem here? Well, for example, the defendants make much of the fact that in a related case I had noticed that, and I had filed a complaint back in October of 2000 against Southern Cal Edison on behalf of other plaintiffs. So if I noticed it, then shouldn't the whole world have noticed it, effectively what Your Honor is saying? There was extensive, and not just a little news story, extensive, continuous publicity about the position of the utilities. There was, and their stock price kept going up. Because of their earnings statement. In large part, yes, that they put out to the public that we're going to get this changed, we're going to get this fixed, we're earning this money. This being what? The state law, the CPUC regulation. Well, really what they were saying was we're going to get the PUC to change when the PUC didn't have the power. They're going to pay us back the undercollections. Excuse me? That they're going to pay us back the undercollections. Yes, that they're going to recover all of their undercollections. And then, of course, they wrote it all off eventually in April of the following year. And so what changed? What changed from the time that they put it on their books as an asset, excuse me, their operating costs as an asset, and the time that they wrote it all off? That's one of our points is that there was no change in the landscape. There was no change in the law or PUC regulation. And that lack of a negative external intervening event under this court's precedent is a factor demonstrating scienter. If nothing changed, why did they make the probability determination in the fall, which they maintained right through to April of the next year, that they were going to recover every penny of this and then all of a sudden write it all off? What the defendants have pointed to is a March 27, 2001, PUC decision, holding that up as the negative external intervening event, where the PUC then, under some emergency legislation, allowed the utility to raise their rates by 3 cents a kilowatt hour. But again, as this court noted in Southern Cal Edison v. Lynch, and as is extensively cited in the complaint in this case, that 3 cents a kilowatt hour went to the state, because by that point the state had taken over buying electricity. Are you arguing that statements by the defendant as to what was going to, likely to happen by the, with respect to a change in the law by the political branches, that that is the statement, that false statement, fraudulently false statement upon which your clients reasonably relied? No, Your Honor. No. The false statements are the earnings numbers. Right. The earnings numbers. Along with statements in their press releases that were growing earnings by 20% this year. And the falsity in the earnings statement is really, I'm trying to state it from your standpoint, is really that they have mischaracterized where this money should go. They're mischaracterizing it as a capital expense rather than an operating expense. Well, I would phrase it that the false statement was, we earned $245 million during the second quarter of 2000, and then we earned $250 million during the third quarter of 2000. That's the false statement. And that false statement comes from the mistreatment of these under collections. Correct. Not in accordance with generally accepted accounting principles. And the treatment of these under collections is, however, stated accurately. That is to say, if you look, you can see how they've treated it. If you look hard enough in their notes to the financial statements, you can find where they say we took $700 million in the second quarter as under collections and $2.9 billion in the third quarter. Yeah. Okay. Yes. So the misleading is that they've mischaracterized it with the consequence that they have earnings that you say, in fact, they didn't have. And by the time the PUC comes along on March 27 and says, you know, we're not going to allow you to get those back any time soon, that forces them into bankruptcy. No. The PUC had always been saying that. They're arguing that that March 27, 2001 PUC decision was the negative intervening event. Yeah. Well, I think what happened is the PUC says, we've been telling you all along and we're continuing to tell you that. And sooner or later, these build up to such a point that forces them into bankruptcy. And when they finally hear it for the umpteenth time on the 27th of March, that's the last straw. They were forced at that point by April of 2001. They had gotten extensions of time to file their annual reports. They had to make a decision. They declared bankruptcy and wrote it all off, $6 billion at that point. While their stock price throughout the fall had been rising, if they had reported $2.9 billion in losses as of September 30th, rather than net profits of $250 million, would that have changed their stock price? Certainly, earnings reports are among the pieces of data that investors rely on the most. After they reported this, that kept them from going into credit default. And if their credit rating went down, as they stated in their annual report, that was an event of default, which would have had the whole house of cards collapse. So by having these earnings, their credit reports remained high. It wasn't until January of the next year that the state had to come in and take over the buying, and they went down to junk status. But if they had reported billions of dollars in losses rather than profits, would that have changed their stock price? Certainly, under most decisions, and I certainly am aware of none that says the opposite, earnings is the most important thing to investors. Okay. If you want to resume some time, you may do so. Yes. Thank you, Your Honor. Good morning. May it please the Court. I'd like to start with the point where Mr. Ames started that, is his comment that when you're selling widgets, you look at operating losses. What he overlooks, of course, is that this is not a case about widgets. This is a case about regulatory accounting that's controlled by FAS 71, which creates a unique regime. Regulatory accounting is further a unique regime because of what this Court has said in the Epstein case and has repeated its comments in Epstein in subsequent decisions as well. But isn't Epstein distinguishable? In Epstein, it said, any attempt to predict the final result of a litigated administrative proceeding was unreasonable for investors to rely upon. But isn't that different than misrepresentation of profits already earned? The reason it's not different, and the reason it's not different, Your Honor, is because in this case, the specifics about the under-collections and about the risks in the regulatory accounting regime were specifically disclosed to investors. Nobody could have read those financial reports and been misled. And, in fact, none of the analysts that Mr. Ames says were influenced by the earnings number were misled either because right from the very beginning, even before that 10-Q was filed in early August for the second quarter, the analysts were saying, this is an arcane arena of regulatory accounting, and while the accounting is proper, we have some concerns because the regulatory accounting regime permits a cash flow expense to be portrayed differently. And if the high wholesale prices of electricity persist, this is going to cause a trouble. The very first analyst report that we presented to the court, which is on the very day that PG&E announced on July 20th its second quarter results, specifically cautioned investors that this was an area of regulatory accounting where there was reason to be concerned. There is not a single analyst report that either side has submitted in the district court or in the record to this court in which discussions of earnings sit alone without some cautionary language with respect to the regulatory accounting issue. Investors knew. Analysts knew. The whole world knew right from the beginning that PG&E in the second quarter of 2000 had spent $700 million more on electricity than it had been able to recover in its frozen rates. Now, Mr. Ames talks about his persistent argument that the PUC was powerless to raise the rates. He not only gets that wrong as a matter of law because he confuses the issue of recovering stranded costs during the rate freeze with the issue of whether the PUC or, as Your Honor put it, Judge Fletcher, the State of California acting through one of its other branches, could raise the rates. There were at least a half a dozen routes by which PG&E could recover these under-collections. Raising the rates was only one of them. That is through the PUC. And Mr. Ames concedes that throughout this entire period, PG&E was persistently petitioning the PUC to change its PTER, rate-making determination, so as to allow these under-collections to be recovered after the end of the rate freeze. We acknowledge that stranded costs could not be recovered after the end of the rate freeze under AB 1890. But what Mr. Ames is doing is confusing apples and oranges when he then tries to argue that under-collections also could not be recovered after the rate freeze. That didn't become the case until that March 27, 2001 decision was issued by the PUC, because that ushered in a fundamental change in the way all of the investor-owned utilities were required to account for under-collections. Prior to that, let me ask you this. For FAS71 to require, and it is stated in mandatory terms rather than permissive terms, to require the treatment of these under-collections in the way that PG&E treated them, it must be probable that they can recover those eventually. That's correct. And both sides agree that the standard for probability is more likely than not. What do we do if we conclude that, in fact, it was highly improbable? If it was highly improbable, then you've got to question whether, taken as a whole, the statements were materially misleading. We would still argue that they were not materially misleading because all of the facts on which, as Your Honor put it, anybody or his dog could assess probability were out there for anybody to look at. And as Your Honor suggested to Mr. Ames, PG&E isn't in any better position to assess probability than any other reasonable observer armed with the same information. The point is that all the information was out there for anybody to look at and anybody to make its own assessment about. Then, of course, you'd also have to get to the CNTR issue, which I don't think we even need to get to in this case because the absence of falsity, the absence of material falsity is so absolutely clear-cut. And let me get back to my prior point, which is that there were a lot of ways other than the PUC allowing recovery of undercollections post-transition period for the undercollections to be recovered. The state legislature could obviously change the law. Governor Davis had made clear his position that utilities shouldn't be left holding the bag for these undercollections in light of the unexpected spiking in electric prices. And we now know with the benefit of hindsight why those prices had spiked so badly, and we know that it was not due to any fault of the utilities. So we could have state relief. We could have federal relief in the form of a FERC determination, Federal Energy Regulatory Commission. We could have a FERC determination that state law was preempted. We could have a federal court determination that the Federal Filed Rate Doctrine required the state to permit recovery of undercollections. And, indeed, that's what the district court in San Francisco has now held in PG&E versus Lynch, thereby validating the expectation that that at least was one of the routes by which relief could be achieved. We have on August 2nd, the same day, August 2nd of 2000, the same day that the second quarter 10Q was filed by PG&E, Loretta Lynch, the PUC chairman, and Michael Kahn, who was the head of the Governor's Commission on Energy Regulation, jointly sent a letter to the governor in which they included a report that specifically acknowledged the applicability of the Filed Rate Doctrine, a PUC decision later that month. I believe it was August 21st. And, again, we've submitted that as part of the record here, specifically acknowledged the applicability of the Federal Filed Rate Doctrine. So that's yet another way in which recovery could be viewed as probable. You know, given the pervasiveness of the regulation of utilities, it almost sounds as if you come out saying that, really, there's no place for – there would never be any reasonable reliance on something that is too optimistically or even falsely set forth by the utility if you could go someplace else and find out the true figures. Well, in connection – Is it – we've got, in effect, a preemption of private securities actions here? No, I think what it is – What's left then? What that's doing is acknowledging what the Court said in Epstein, which is that utility regulatory proceedings are public proceedings. They're open to the public. Everybody knows it's intensely political. And it's inherently unreasonable to rely – for an investor to rely on the outcome as a basis for investment, particularly whereas here we have full disclosure right from the get-go of the $700 million in under collections in the second quarter and of the two – Disclosure in the – And, of course, amplified by all the disclosure that was going on in the press and in the analyst reports. Right. Well, I guess I'm just sort of curious about what is left. What is the role of private securities actions in keeping utilities honest in your view? Well, certainly – Given the pervasiveness of the regulatory process. That would not in any way be immunized, to use Your Honor's words. What's in the books. Pardon me? Well, but even a statement of what – a false statement of what is actually in the books, in your view, would not – you know, what is actually happening in the – with respect to the financial condition of the company currently is still subject to disclosures to regulatory agencies. If somebody is cooking the books of a public utility, that's just as actionable as – If it's already – if they're lying to the agency as well. Right. Right. You can't – a public utility can't lie any more freely than anybody else. The point here, though, is that what Mr. Ames is quibbling about is the treatment of a particular issue that's controlled by a gap provision that's unique to public utilities, and it's a situation where all of the underlying facts were fully disclosed continuously, such that nobody could reasonably have been misled by the way – and bear in mind that – Is that a factual question or a legal question? Let me put it another way. Well – I mean, do we – are we supposed to hold as a matter of law because these are disclosed in some report to an agency that therefore there can be no reasonable reliance on what is in a – They weren't just disclosed to an agency. They were disclosed to the public and to the SEC and the 10 Qs. Well, I understand. They're all public. Of course. That's what I mean. If you disclose the facts that are allegedly concealed, there's no material falsity. There's no statement that was false or misleading when made. And the point here is that all – what Mr. Ames' case boils down to is a claim that they should have called the shot differently in terms of probability, bearing in mind that they had to call the shot one way or the other. FAS 71 didn't give them the option of saying we're not going to call the shot at all. I understand. I'm just trying to – I understand that part of it. I'm just trying to feel the reach of your position. Are you saying that it doesn't matter what is stated in a report that is directed to the public only, a public statement about what the financial condition of the utility is. It doesn't matter if that's false or not as long as the true facts are disclosed to an agency in a public report. No, I'm not saying that at all. Because I think if – I mean, I think you'd have an interesting question if there were a public filing with the PUC that said something different from a public filing with the SEC. No, I'm talking about a press release. A public filing that's different from what's in a press release. That's true. Or a digest of a financial statement that is given to the public. Right. And if you're looking at what's in a press – I mean, you can't lie in a press release. That's right. Unless – well, yeah, I should say you shouldn't. Well, sometimes it's false in the press release, but it was accurately reported to the SEC. Or accurately. Is it your position that there can be no reasonable reliance on the press release? You can do whatever you want. I don't think that's a reasonable reliance issue. I think that's a materiality issue because if the total mix of information that's available to the investing public, whether it be from the press release or from other sources that reach the market with the same degree of intensity to use the Apple formulation, the Apple computer formulation, then there's no material falsity. So if there were inadvertent falsity, for example, in a press release, but the public wasn't misled because the analysts immediately picked up all of the facts, and I think we could apply that. Because it's sort of a factual question. No. It's not a factual question if we're dealing with information that's judicially noticeable. If the court can determine as a matter of law that enough information is available to the public to determine that there's no material falsity, then that's an issue that's ---- Well, the court can take judicial notice of what information is available, but it can't take judicial notice of whether or not it's sufficient. It has to make some kind of determination that it's sufficient. And what I'm trying to know, is that a factual question or is that a legal question? Well, I think it depends on what the disclosures are. In our situation, for example, it's clearly a legal question because the record is so overloaded with disclosures of not only the specifics of the undercollections and the way they were being treated and the risks that the situation might change due to future regulatory action or inaction and various other factors that nobody could have been misled by this particular total mix of information. Now, I think any of us could hypothesize a situation that would present a closer question factually, which a court might say shouldn't be decided on a motion to dismiss. Here, we weren't anywhere close to that line. And then, of course, if you take into account the utter absence of any allegations that would lead to an ability to infer Siena were in even clearer territory as a matter of law, this is an issue where, as Judge Matz said in the Edison case, in the part that Mr. Ames omitted from his excerpts of record, but we then submitted when we submitted his full opinion in our supplemental excerpts of record, Judge Matz's opinion makes clear that where, as in both the Edison case and the PG&E case, the details regarding the regulatory accounting are promptly made available to investors, it's flatly inconsistent with any inference of Siena. Because if you're trying to fool somebody, you're not going to lay all the facts out the way they were done here. And indeed, in our case, the facts were even more clearly laid out than they were in Edison, because in Edison, the amount of the under collections was not disclosed in their second quarter 10-Q, which led Judge Matz to say he can't find as a matter of law, as to their second quarter, that there was no material falsity. But then he goes on to say he can say as a matter of law that there's no Siena, because the company relatively promptly thereafter disclosed the amount of the under collections. In the PG&E case, they were disclosed for the second quarter in the 10-Q to the SEC, and they weren't buried deep, as Mr. Ames tries to argue. They were repeated in multiple places. They were not only in the financial statement footnotes. They were also in the MD&A discussion, which is routinely acknowledged to be the part of the 10-Q that is most important to investors. So there was absolutely full disclosure. The analysts picked up on it from the get-go. There were at least a half a dozen ways that these under collections could have been recovered. Another one that I hadn't even gotten to yet is that, of course, if the wholesale electric rates come back to normal levels before the end of the rate freeze, once again creating headroom, then the very mechanism envisioned by the original deregulation formula would provide an ability to recover the under collections, because that's the way the process was supposed to work. Let me just make sure that everyone understands how fundamental the change was that the PUC affected in its March 27 decision that led to the filing of the bankruptcy the following week. As we pointed out in our brief, the regime for regulatory accounting under AB 1890, as implemented by the PUC, required utilities to maintain two kinds of accounts, what was called the TBA or the transition, excuse me, the TRA, the transition revenue account, and then the TCBA, the transition cost balancing account. Under the PUC decision that was in effect at the start of the second quarter of 2000, a utility was required by PUC regulation to record under collections in its TRA and then only to the extent there was an over collection would the headroom be transferred to the TCBA and be available to recover stranded costs. What the PUC said in its March 27 decision was that retroactively we're now going to require the utilities to also transfer the negative amounts from the TRA into the TCBA. The effect, of course, was to vastly increase the amount of unrecovered stranded costs, which effectively made it impossible to recover stranded costs during the rate freeze and left no possibility that under collections could be recovered post-transition through some rate structure. Thank you, Your Honor. I believe I have a couple minutes for rebuttal. Could you comment on CNR? CNR with respect to the March 27 decision? Or prior thereto. Well, CNR is that they knew that their earnings numbers were false when they published them. They knew that under the existing law, as repeatedly reaffirmed by the PUC, they could not raise their retail rates, they were operating at massive operating losses, and that they did not report those operating losses on their earnings statements. I understand your position. With respect to Chief Judge Schroeder's question as to when is it a fact question and when is it law, this is from INRI Stack Electronics, the materiality of an omission is a fact-specific determination that should ordinarily be assessed by a jury. Only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are those issues appropriately resolved as a matter of law. For example, in their second quarter press release, performance across the board builds on momentum of first quarter. PG&E Corporation reported second quarter earnings from operations of 69 cents per share, or 253 million. Pacific Gas and Electric posted second quarter earnings of 216 million. Results reflect an increase of 26 percent compared with the second quarter 1999 diluted earnings of 172 million. No mention at all about the under-collections in that second quarter press release. Their third quarter press release, PG&E's third quarter diluted earnings from operations were 68 cents per share, or 248 million, compared with diluted earnings from operations in the same quarter last year of 50 cents per share, or 185 million. Down below, the results posted by National Energy Group and Pacific Gas and Electric Company this quarter reflect continued solid execution and strong forward momentum, said Robert Glynn, PG&E Corporation chairman, CEO, and president. We remain on track to surpass by several percentage points our goal of growing operating earnings per share by 8 to 10 percent for 2000. Now at that point, they had lost 2.9 billion that they had put on their balance sheet and taken off their earnings statement. Is it so obvious from those press releases that to any reasonable investor that they really had these losses, their stock price certainly didn't reflect it. Their stock price kept going up. They raised $2.2 billion in the fall based upon these numbers. If they had reported those earnings, those actual losses, the credit agencies would have downgraded them to junk. They never would have been able to raise that $2.2 billion. They kept this going directly in the face of the law. Thank you very much, Your Honors. Thank you.
judges: Schroeder, Dw Nelson, W. Fletcher